082707, Fernando Corral Jr. v. Mervis Industries Good morning. Please report, counsel. My name is Mike Reagan, and together with Mike Mahoney, I'm seated at the counsel table here today. I represent Fernando Corral Jr., the Administrator of his deceased father's estate. The plaintiff's case has two categories of counts. Counts 1 and 2 are for common-law negligence. Counts 3 and 4 are grounded in Section 414 of the Restatement Section of the Torts. But all four counts are common-law counts. It is just the 414. And in fact, they're really, as you indicated, they're all common-law counts, and 414 is indistinguishable from common-law negligence, isn't it? It simply restates it in a clearer fashion so that we can have some sort of template to follow when we're talking about contractors and independent contractors. I would agree with almost everything you said, and perhaps with all of it. Justice Carter, depending on the Third District, says precisely that, that this is a common-law construct that it's up to the courts to give it flesh. To the extent that 414 is a confining template, if there's something in there which narrows the scope of duty down, then I would say that it doesn't necessarily cabin the entirety of the common law, that we do say that counts 1 and 2 are important. Here's the question, then. Do you have a case that involves the equivalent of a general contractor dealing with an independent contractor in which 414 is not relied upon in deciding the issue before? Is there a case that deals simply with common-law negligence? I'm not aware of one. COSA and Melchers do. And they are discussed in both briefs, and they talk about the duty owed. And they also, by the way, cite back in time to like 1910 or something like that. And the defendant does not now challenge in this Court the existence of duty. And it says that whenever the defendant's brief says, I believe it's page 8 or page 10, that when there is a construction project that many crafts, many people are brought together, and that the duty is owed without respect to privity and without respect to contract. So, yes, Your Honor, there is a large line of cases going back to safety. When you mention duty, it does sort of trigger this question I have regarding an assertion in the Mervis brief that Mervis did, in fact, control the work. It set it up, it had its sections and moved each section into a more convenient spot for the independent contract to further cut those sections. And so the question is, does Mervis claim that it did not control how the decedent did the actual cutting? I mean, is that their claim, that they didn't control how he used the welding torch to actually cut it? That, you have driven right to the very heart of this case. And that is their position. They think that this Court only has the right to look at that very narrow question of how did Mr. Corral wield the torch that day, what bolt did he cut, and they're saying in that narrow process, in cutting four or five bolts, whatever it is, that we didn't control it, we didn't have any input on it, we didn't know what he was doing. That narrow thing. But certainly, when it comes to moving that cut section for further cutting by the independent contractors, they set it up, and they certainly, the burden wouldn't have been much greater for them to have set it up in such a manner as to have it secured with chains or with any other means to make sure that it doesn't accidentally fall on the worker. And that is exactly what this case is about. I mean, it's totally and completely, they have taken this large enterprise, it really is, this is not somebody working in a garage somewhere, this is a big business, I don't mean that in a jorny sense, but what I mean is it's a big enterprise, it's a big dangerous enterprise, and they took rail cars, rendered them unstable, ripped off all of the supporting structure of it, and left the D-rack, these are, in my own respect, relatively unsophisticated persons. Counsel. Yes, ma'am. Relatively unsophisticated person with 25 years of experience where his comrade indicates that they are not accustomed to having any other outside help, that the decedent, who had been all these years responsible for making sure that these D-racks were secured and that they were properly cut. That's one view of the evidence. Why don't you add how long he worked for Mervis? A very, he was doing this work for a very, very short period of time, and what we know from the record is that the deposition was taken to the guy five or six hours, five or six years after it, and he said that he thinks that he's been doing the D-racks five or six years previously. So it was, they weren't doing it very long. There's very little evidence in the record of this man having done, worked on rail cars before. We don't know how those prior D-racks were cut or how they were stationed or how they  We know nothing about that, Your Honor. And Montiel, Justice Hall, the person you were referring to, when his deposition was taken, he had had a stroke. Before that, he freely admitted that his command of the language was not the best, and then because he had difficulty speaking because of the stroke, and he said that he had worked on other locations where they had bracing for what he called safety, was the word he used for bracing, on other projects. So because of the change in the And the two of them basically had a tag team operation going. Yes. Yes, exactly. But when you read the transcripts of Montiel's deposition, there's really not much you can bring to bear here. But because of the defendant's change in position, you know, the argument to the trial court was very, very narrow. The trial court ruling is very narrow. There's no duty. The trial court never discussed the facts. There's nothing said about the plaintiff's expert. There's nothing said about anybody else. It's just this man's an independent contractor. Therefore there's no duty. There are all sets of counts. Regarding the independent, excuse me, regarding the independent contractor status, you know, I ran across Posner's opinion in Guire v. Turner, the second after a jury finding in favor of Turner. And it distinguishes or it generally talks about why the general contractor is not in a good position to assure that his subcontractors exercise due care. And the reason is because the subcontractor hires, fires, trains, and supervises its own employees. Who did the hiring in this case? It was Mervis. So in a sense, then, it's not the classic subcontractor working for a general contractor because the general contractor, to the extent that that's Mervis, hired the individual directly. It's exactly the case. And normally when a general contractor, owner, whoever, hires a subcontractor, an independent contractor, they do it for a particular reason. That is the sub has some specialized expertise, has tools, has employees, can do work that the general doesn't do. That's not the case here at all. This man looked like an employee for many, many purposes. He surely, he knew how to, you know, to operate a torch and to make those cuts, et cetera. And I still don't see how you get past the fact, you say something about Montiel not being able to speak as clearly because of a stroke, but he and the decedent had worked together for some six years. And his testimony was that they were the ones who decided on how they would torch and cut those rail cars. And that he also testified, according to my recollection of the record, that Montiel and Or cutting the cars. As we sort of touched upon a few minutes ago, there's nothing in the record. It's absolutely silent as to what the arrangements were with cutting other rail cars. We don't know what they were cutting off. We just don't know anything about it. We also don't have anything in the record that the defendant prohibited the use of any kind of clamps, chains, or bracings either, or that the decedent had even requested these types of aids. Isn't that correct, counsel? That is correct, Your Honor, except this. The court sits here to bring its practical experience, its judgment, and its knowledge to bear on this, and the notion that in this large enterprise, lots of machines, massive rail cars, huge pieces of metal that were rendered unstable, that Mr. Corral would be permitted to say, okay boys, here's how we're going to do it now. I want a crane here, I want chains here, I've got my own cranes, I've got my own chains, we're going to set it up this way. It just defies any... But there's no evidence that the defendant ever ordered the decedent to cut those D-racks without bracing or without any additional help. That's just you speculating. But doesn't that reach to the issue of supervision in the final analysis? Yes. But the supervision, the defendant's view is this very extraordinarily unrealistic narrow thing that for the two minutes, and I don't know how long it takes, but let's say two minutes, that it takes to cut a few bolts, that Corral was in charge of the place. And the reality is that this was a mass production deal, it was a production line, they brought the guy in and said, okay, cut here. Now, one thing that I think is very important, and Justice Garcia, cut me off at any time because I can see there's... Well, you know, let me quote from the Mervis' brief, where they assert that Steele, and Steele is the supervisor, positioned those sections that the decedent and Montiel would the several bolts that had to be cut to the decedent. And Steele knew the work could be dangerous. Steele considered safety, but believed that the decedent knew how to work safely. And the limited question before is this simply a question of law, whether this should, in fact, enough has been presented to allow a prior effect to determine whether there's any liability on Mervis' part or not. And to say that under these facts, the law does not protect an individual hired by a major company to do work at its direction, strikes me as being an awfully harsh rule. I, and me also, Your Honor, I wrote in the brief that affirming this judgment with the as an independent contractor and say, you're all in charge of your own safety. I said that this result is unimaginable, and I left the word in the brief. It's more colorful than I might normally use, but it is true. And I said that it would set the law back decades to do this, and it would. Now, you're going to hear in a second... Counsel, but in your brief, you pointed only to a portion of Steele's testimony, because when we further look at Steele's testimony, he says that, yes, the decedent's work was dangerous, but then he further goes on to elaborate that the decedent's work could be dangerous if certain bolts on the DREC were cut out of sequence, or if a torchman was used in the facts of this case by this independent contractor. In a way, no, I can accept all of that, because in one second, I'll quote to you contrary... This is the testimony? I'll quote to you contrasting testimony, and what we're here on is the question, de novo review, de novo review, as to whether there is a question of law, a question of fact, rather, and all of the presumptions, all of the inferences, the whole weight of the law is that a summary judgment is not to be entered unless there is no genuine material trial of the true fact. So, you will hear in just a second much of what you just said, Justice Hall, about what Steele, who's the Art Supervisor, had to say, but he says this at Volume 10, C-2386, what makes you believe they could do it? Answer, because I showed them how to cut the bolts on it. I didn't do it myself, but I showed them where the bolts were at to cut. Now, you can perhaps look at other parts of the record and say, well, you know, he inferred something else here, but that's a question of fact. That's for the jury. Now, this business of, you know, was there a particular way in which to cut the bolts that was required, and if you didn't do it, it was unsafe, if you did do it, it was perfectly safe, is nonsense in this case. All, and we've cited pieces of the record, but it's clearly the case that there wasn't any way to do it. The defendant's brief says there were no rules, there were no standards on how to make these cuts. It's just, and it was sort of voodoo as to whether the piece was going to stand up. I'm sorry, it was sort of? Voodoo, as to whether the piece was going to stand up or not. I don't understand that. Because there is. That was what? Voodoo? Yeah, there is a lot of voodoo. I'm sorry. I did not understand your word. Voodoo. Voodoo. Voodoo. Magical. Magical. Mysterious. Because they, you know, they were talking. It's amazing. It is. Voodoo has no hands or something, I don't know. So they cut the pieces, and the slag, okay, the molten metal left after you cut, would frequently hold the piece up, and it was only that, a very tenuous thing. Holland says it could fall in any direction. You couldn't tell what way it was going to fall. And Steele said, well, you should probably be safe because you've got a three-foot torch, and if you stand out of the way, which is what the evidence says, then you shouldn't get hurt. Now that's not any conception of modern safety. I think, and eventually my time will run here, but I want to say this. If, Justice Garcia, you asked me about, in the beginning, about is there any one particular case, and I want to shift that a little bit and say, okay, if I can leave you with only one case today that I think is particularly important here, particularly illustrative, it's Garcia versus Wooten, in which the crane was used to, was normally to be used to lift buckets of bolts, pegs of bolts out of a crane basket, but the general contractor said, well, we have to use the crane for something else, and he said, you can't use it, Mr. Subcontractor. We're going to have somebody else use it, and the Garcia opinion says that the proximate causal chain was set up by the decision to withdraw the use of the crane, whereas the defendant in that case said, no, wait a minute here, the only work we're going to look at is the plaintiff's decision, the subcontractor employer's decision to lift the kegs of bolts out of the bucket by hand, that's all you're allowed to look at, and the court said, no, the proximate causation is the larger enterprise here, it was the decision that began, causation began with the decision to withdraw the use of the crane. In this case, causation began with the decision to rip off all of the pieces supporting these D-racks to move them into this position, which they might be tilted in any particular way, to provide the, to not provide, you know, bracing, et cetera, et cetera, and to invite Mr. Corral and say, cut these five bolts. Counsel, how do you get past the case of Conaghan v. Caplice, that it says at the restatement that 414 really doesn't apply to an independent contractor who causes injury to himself as opposed to a third party? In that case, there's a, in that case, written by Justice McLaren in the Second District, there's a very serious logical flaw in the overall analysis of the case, which where he says that 414 liability is vicarious only. He says it is vicarious, it is responding at superior, he uses both of those phrases, and therefore, how could it possibly be that the person who is hurt, an independent contractor, is entitled to recover because of that? I'm not sure he uses vicarious. I mean, he used master servant and responded at superior. I think you're right, Your Honor, and I do apologize. I overspoke. But he does, I know he used two alternative phraseologies for the same thing. So Conaghan's just wrong. I know. But I have a question. Let me ask a very basic question. When you look at that case and there are three different bases for the decision, are two dicta and one the holding of the case itself, or are all three the holdings, which would make it kind of strange, I think. The classic definition of the holding, or actually the flip side of it is what's dicta, is that which becomes, is not necessary, and the logical, necessary logical change to reach the conclusion. So it becomes dicta. Except that the restatement does, in fact, both at comment A and B, recognize direct liability. Exactly. We agree that there is direct liability, and we have But you're saying that it only deals with vicarious. No, I'm saying that the Conaghan case, however you pronounce it, was wrong because it recognized only vicarious liability, whereas we have disclaimed in the trial court, and again here, that we are proceeding on vicarious liability. We're going just on direct liability. And let me suggest something else. When the language is to others, if this were a statute where we have to give meaning to every word in the statute, I can understand where to others would have a very significant meaning. But the restatement is simply a guide. It is simply a restatement of what the law is. It doesn't give every single word substantial meaning. And I question how, you know, what's the policy behind a general contractor duty, finding a duty, has a duty of care towards workers of a subcontractor. Why would the law say that that duty of care to the subcontractor's workers cannot extend to the subcontractor himself? What's the rationale for that? There is no rationale for that. And so I agree with that statement. I agree. But there is case law for that. Well, but we'd have to look at the rationale. And the rationale of Penagon is wrong. Then there was a – it was certainly missing something. Let's say that. And I almost put a classic Catholic school diagram of a sentence into the brief, but I did explain it in words at page 11 of the reply brief. And so if you look at the other's – through other's language, it says, one, and then there's this modifying phrase, one, who entrusts work to an independent contractor but who retains the control of any part of the work, okay, that modifies one, is subject to liability for physical harm to others. So it reads, one is subject to liability for physical harm to others. Obviously, you can't be liable to yourself. And in fact, when you think of it, subcontractors tend to be business entities. They tend – they cannot suffer personal injuries because of a breach of a legal duty by the general contractor. So it's almost nonsensical. It is. It is. I don't know what else to say about that. Certainly in the vast majority of the cases, there are cases where there are independent contractors that are persons, such as this case, and you question whether that simple – those two words should apply. And then 414 talks about one who trusts work to an independent contractor, okay, is subject to liability for physical harm to others for whose safety the employer owes the duty of care. And so all four counts come together because we've talked about under Counts 1 and 2, there is a duty of care owed and the defendant now admits it. And so that duty of care comes into 414. Now, the flip side of this is that the trial court also regarded all of these counts to be essentially seamless because he said under 1 and 2, there's no duty owed to an independent contractor himself. And then he gets to the 414. He says there's no duty owed there either. It's the same thing. It's the same misunderstanding. But if you go past all of that and go back to the common law negligence theory, I still fail to see why the independent contractor wouldn't be entitled to summary judgment in light of the issue of reasonable foreseeability. How is it reasonably foreseeable? And, of course, we all know that no legal duty arises unless there is reasonable foreseeability. Here, an independent contractor with 25 years of experience as an experienced welder torture, how is it reasonably foreseeable that he would create this type of incident or an accident leading to this type of injury? He almost didn't create it. Holland, Eugene Holland, a very experienced expert, says that cutting these massive pieces of steel without brazing is going to get somebody killed. Those are his words. And he says there's no way to cut safely without brazing. And so it's very foreseeable. And you can't, I mean, if you want to hang on to Corral, 25 years of experience, then let's also hang on to Mervis, a tremendous amount of experience in much more sophisticated ways. We're talking about people here with college degrees who had roles as safety supervisors. And who had videotapes on safety that they did not show to the independent contractors, but that were available to its own employees. Right. Right. And the foreseeability, I mean, if you close your eyes and picture yourself in this situation with coming into this enterprise and making a few cuts, and then hoping that the slag would hold it up for a while, and hoping that your three-foot torch was long enough that it's not going to fall on you, that's not safety. Holland makes it very clear. The trial judge did not consider Holland. The defendant argued that Holland's testimony was, quote, improper and irrelevant, because we were talking simply about a duty. And the trial court never reached these other questions. And I believe the record, Your Honor, I hope that after you leave the bench, Justice Hall, that perhaps something I've said will perhaps convince you of that fact. Thank you, counsel. Thank you. Appelli. Good morning. May it please the Court, I'm Paul Esposito, and I represent Mervis Industries. A lot of the attention today has been focused on the restatement counts. I need to address the first two counts, these general negligence principles. It's been said more than once today. It was certainly said in the plaintiff's reply brief that we have changed our position, that we have gone from saying that there was no duty to that there is a duty. That is absolutely incorrect. That would end the case, wouldn't it, if there is a duty? I mean, the summary judgment was only on that basis, wasn't it? Summary judgment on the basis that there was no duty either under common law principles or under the restatement. So if you change your position, we'd have to remand it. Well, if you were to recognize that there are these general principles out there that are controlling as opposed to the restatement of what you were saying. What I'm saying is taking the position that there are these general negligence principles that are controlling, our brief was misquoted. If you go, and I want to point this out because I think it's important. If you go to page 10 of our brief, which is where the language from our brief was cited, at the very bottom of that page it says, besides, Mervis's position is not based on a distinction between independent contractors and their employees, with a cite to plaintiff's brief at page 28. It is based on the absence of evidence that Mervis created a foreseeable risk of harm to deceit. Now, if you go into the yellow reply brief, and if you go to page 1, and again at page 4, you will see this quote, and it's towards the bottom of the page. Mervis's position is not based on a distinction between independent contractors and their employees. It is based on the absence of evidence that Mervis created a foreseeable risk of harm to deceit. What happened here are things were dropped from what we said. At the beginning of the plaintiff's quote, he drops the words, besides, without any indication that that word was in there. Immediately after the first sentence, he drops the phrase, plaintiff's 28. Again, without any indication. Why is that significant? Let me show you why. Because when you go to page 28 of the plaintiff's brief, plaintiff's brief says, although this is not a premises liability case, we think that their premises liability cases provide a useful analogy. Then the quote from the Nowicki case, a Supreme Court case in 1973 that says, the owner owes such a duty to an independent contractor or his servants while working upon his premises. After that quote, he goes on to state, plaintiffs rely upon those cases here not as the source of the duty sued upon in this case, but rather as persuasive authority and reputation of defendant's argument that a distinction is drawn in the law between independent contractors and employees of independent contractors. That's what we were faced with when we were writing our brief. So we get to our brief, and at page 10 of the brief, we say, at the bottom, at the start of the paragraph, plaintiff tries to draw an analogy to premises liability cases, citation to page 28. But because plaintiff chose not to proceed under a premises liability theory, those cases are irrelevant in the site, plaintiffs 28 and 29. Besides, Mervis's position is not based on the distinction between independent contractors and their employees, page 28. It is based on the absence of evidence that Mervis created a foreseeable risk of harm to the seat. What was happening here is plaintiffs were saying, I'm turning to premises liability cases, and we are simply saying those cases aren't relevant to this situation. And besides, the distinction is not based upon independent contractors or servant independent contractors, which it wouldn't be in a premises liability case. If you come onto a premises, there's going to be a duty, whether you are the invitee or the servant of the invitee, it's based upon the question of the foreseeable risk of harm, which is just what Judge Hall said earlier. Can reasonable minds disagree on that reasonable foreseeability issue of creating harm to the extent that we have an expert who says that in the absence of bracing, the cutting of that piece is a dangerous work that is enhanced by the absence of bracing, and to the extent that Mervis positions that piece to be cut in the place where it is to be cut and then directs the independent contractor to cut it right there without the bracing, reasonable minds can disagree and say, hey, that sounds like reasonable foreseeability of an injury happening. I hear two parts to that question, Your Honor. Let me see if I can take both parts. I'll go with the second first. The second is the placement of the piece. The case law is very clear. It's not where the work is being done. It's whether you're controlling the means and methods of the work being done. And, in fact, at page 22. Well, you'd have to define means and methods because means and methods cannot mean simply the use of a blowtorch to cut it. Methods could be where you're cutting it. It could be in the position that you're cutting the metal piece. It could mean all that. Well, first of all, the cases say it's not the where, so I'll stand on that. But let's go to the where. It's not the where of where the work is being done. That's it all controlling here. And it's all meaningful. But it certainly was. The where was controlled by Mervis. You can see that. Yes, but Mervis put it down. There's no evidence that it wouldn't have put it down elsewhere if Mr. Craven had said, hey, could you put it over here? I mean, the record doesn't speak to that issue. And when you say put it down, there's another option. It could have put it down as opposed to being up. It was on the ground. It was down. Well, but somehow or other it falls on him. Well, what happens is it's a frame. It's basically what it is. So it can't be any more down than it was. Yes, it's going to be on the ground, but because it's a frame, the frame extends up. Yes, like a door. Correct. But let me go back to the first part of your question, and that was what the expert said. Right. The expert can make that statement all day long. The question comes whether there is a duty. This is the question of law, whether there was a duty on the part of an owner, which we were, or a contractor, if you want to call us a contractor, we were both, I guess, to an independent contractor to provide that bracing. When you hire, Your Honor, or any of you hire a roofer to re-roof your house, do you have a duty to provide fall protection to that roofer? If you are building new construction and you happen to be the general and you're bringing in a bricklayer, do you have the duty to provide a proper scaffold to that bricklayer? That goes with the job. That's why they're trying to extend this duty concept far beyond. Before you ever get to whether we breach the duty, which is what Mr. Holland was saying, that we fail to do this, you have to establish that we have the duty. And that's what the court was saying, both as to Counts 1 and 2 on general negligence principles and Counts 3 and 4 on the restatement principles. There just isn't this duty. And what's happening here is... of steel in indicating where the cuts should be made in the first instance. And isn't that important for our consideration? Well, no. I understand your question. Steel was out there. Steel testified that in 25 years of his own experience, he cut, torched maybe 15 times. Steel testified that he learned how to do this from watching Mr. Montiel and Mr. Corral do this work. And it seemed like the logical way to do it. You know, he said in questioning on his desk, well, I mean, I don't know how to do it, but I'm watching these guys, and it seemed like the way to do it. What Steel is testifying to, he said, and Ms. Riggan read part of this, but not all Steel said, because I showed him how to cut the bolts. And he was asked why he believed these guys can do this safely. That was the question. And I'm reading from page 22 of our brief, which cites the record. And so Steel says, because I showed him how to cut the bolts on it. I didn't do it myself, but I showed him where the bolts were to be cut. So he's just saying, this is where these bolts are to be cut. Question. I thought they showed you how to do it. Answer. They did. But the only thing you have to do is if there are six bolts on each one, you cut the bolts, and you stand at the end, and then you cut the bolts, and then the one bracket on the bottom, and that's all there is to it. He was not directing them, instructing them, certainly not ordering them to do it in any other way than the way they wanted to do it. He just was pointing out, hey, these bolts need to be cut off here. Mr. Montiel testified, I did it my own way. And Mr. Montiel also testified that when they do this work, they don't use braces. They don't use clamps. They don't use any of this stuff. Montiel and Corral were very loosely speaking, not in terms of legal partnership, but I think at one point they called themselves partners. They kind of worked together. I think they drove up from Chicago together, back down in Chicago. It was loose. There were two guys, both independent contractors, that were kind of doing this stuff and had been doing it for a long, long time. They were the experts on this job. There was questions that came up, and there was discussion that came up about this, the fact that there's this little micro piece or whatever was said on this job. You know, an owner or a contractor has the right to let his work be done by whomever he chooses. So he could hire anyone without any regards to the skill of that individual? He could hire anyone without the 25 years' experience and expect that person and to be free of any liability should that person harm himself? Well, that's not what I was saying here. What I'm saying, and let's keep in mind, these guys were highly, highly experienced people. Mr. Corral, Mr. Montiel were cutting towers. You know, when we were talking about pieces extending in the air, they were cutting towers before they were working on this job. So let me get this right. Mervis gets involved in terms of the skill level of the individual it hires, but chooses not to make sure that that individual who has the necessary skills will perform the job Mervis wants done in a safe manner? Well, you know, that's not correct. I mean, I think the testimony is that Mervis found out these guys can do the job before they brought them in, but let's take that analogy again. Let's go to the roofer. You bring a roofer in. You like to think you know he's good. I mean, you've heard from your neighbor, hey, I hired him and he's good. You know, when we hired our roofer some years ago, we hired him because we saw him working across the street. That's all. We saw him because he looked like he put on a nice roof. You know, I mean, that's a lot of times how things happen. Is there any evidence? Was there any evidence offered that the defendant's personnel ever saw the decedent working in an unsafe manner or that they knew or should have known that he was working in an unreasonably dangerous situation? I'm sorry. I'm going to cut you off. There's no evidence of that. As a matter of fact, that's one of the standards of these direct liability cases. There's got to be actual constructive knowledge that there is dangerous, unreasonably dangerous work going on. Dangerous is just not enough. I mean, a lot of work is dangerous. I mean, carpentry work is dangerous. Electrical work is dangerous. It's got to be unreasonably dangerous. You've got to know that someone's doing something in an unsafe fashion, and there was none. The accident itself was unwitnessed. I think everyone agrees with that. Let's get back to the roofing analogy for just a moment. There are certain jobs that have inherent risk, and you certainly cannot eliminate every risk. They do. And that certainly is part of roofing. And as a homeowner, you want to hire someone who has worker compensation insurance to make sure that its workers are covered, and you want to make sure that this person has the insurance to insulate you from any liability. And to that extent, that analogy simply doesn't apply when Mervis is hiring an individual to serve as an independent contractor where he cannot have worker compensation insurance. Well, that may be true. I mean, let's keep in mind here. I mean, we can't take Mr. Correll's responsibility out of this situation. If Mr. Correll doesn't like working in a situation where he doesn't have insurance. I think there were stories about that in the early industrial age of the United States, about you either enjoy the job under the conditions that we provide, or you find another job. But you know what, Your Honor? We have many, many employees there. They chose to sub out this work. Like you chose to hire a roofer. Or you chose to hire anyone you please. They can, you can choose to do this. It's not, what I'm saying is questions of insurance here don't drive duty. And don't get me wrong. I'm not trying to put down Mr. Mervis. You know, he is who he was. He made the decision that he did. What we're reacting here, Your Honor, is where the duty is. I mean, the question, and the fact that a trial judge in this case, I mean, Judge O'Brien had this case. He was the trial judge. And he looked at this case and said, there's nothing to try. Well, Mr. Esposito, let me make it clear. I don't mean to suggest that there's something, you know, nefarious going on or, you know, someone is putting, or that Mervis is putting people under arrest unnecessarily. I mean, that, but the real question before us is one of law, and one of law reflects the policies of our society. You know, the classic factors of determining whether a duty exists or not. And just generally, it is whether the law should impose a duty of care upon Mervis to make sure that the work environment for its subcontractors is safe. And to that extent, it's a reflection of what we think, where the risk should lie. Should it lie with Mervis, or should it lie with the subcontractor? Who really controls how that risk should be addressed? And to some extent, Mervis is certainly in a better position to address that risk than the subcontractor who's worried about how much, how many tons of scrap he's cutting so that he can earn as much money as he can. If he spends time bracing it, then he's obviously not cutting it, and therefore not making any money. And maybe the law says, you know what, in that situation, Mervis should be responsible for the bracing to make sure that no one is injured. And I think a couple of points you're addressing. The irony, I guess, if you will, is if Mervis had decided to make Mr. Crowe an employee, we wouldn't be here today either because this would have been through the Workers' Compensation Commission. Which way does that cut? Pardon? Which way does that cut? He would get some money before showing a no-fault. Mervis would have bought insurance. Mervis would have been covering. Right. Mervis would have been optimally paying for it by virtue of higher premiums in the future, if no other way. Exactly. And that would have been regardless. A guarantee of walking away. Right. Well, that would have been regardless of its fault, Mervis's fault. The fact of the matter here, though, is, and I understand your irony. I mean, it's very interesting. It's an interesting question. I guess it's a real question. But the law has to guide us here. And the law has not gone as far as your question presents. So what's happened here is the law says, hey, listen, you know, independent contractors are, to a certain extent, on their own in terms of their need to protect themselves, unless the owner, the general, whoever, has retained control. That's where we get back now into the 414, unless there is this retention of control. And that was the point, I think, of some of the discussion, some of the questioning, that there has been no retained control. Retained control means under the law, and under a lot of first district law, a lot more than the ability to generally supervise, a lot more than the ability to stop and start. Let me ask you this. And I apologize for interrupting. But I'm going to go back to your analogy with the roofing, because I like that. You've got the case of Esposito v. Paddy. And if Esposito Roofing's come over and Paddy, the homeowner, says, Mr. Esposito, this is where I want the shingles replaced right here. This is where you're going to come. And I walk away. You walk away to do it, or walk away? I walk away. Oh, you're okay. I'm sorry. Yes, yes. And Esposito Roofing is there doing the shingle work, falls, and is injured. Right. You're out of the box. I'm out of. Me being the worker, I can't sue you. Because? Because I didn't retain any control of your job. Because I gave you the job. The requirement of the job was to change these shingles. But I didn't control the means and the methods by which that job was done. I didn't control the operative detail by which that job was done.  Am I indicating to you where to replace shingles or where to cut is not significant enough control in your estimation? Exactly correct. And that's what the case has recognized. It's the ability, you have to be able to say that this contractor couldn't do the job the way he wanted to do. That's where the Garcia case, very interesting case, but very distinguishable from this one. It's distinguishable because there the general took away the crane that these guys wanted to use to do the job. And because they didn't have the crane available, they had to do it in a different way, and it was that different way that caused the accident. That wasn't the situation here. We put down the work. Here it is. It's right there. We want you to cut it up in a square. It's like the shingles. The shingles are right there. Let me interrupt just a moment because I want to address something that you assert in your brief on page 9. You say, you know, a contrary rule, a rule contrary to the outcome below would make the Mervis the insurer of the contractor's safety. And that's a bit of the sky is falling sort of argument where because all we're dealing with is the legal duty, the existence or not of a legal duty. And every case in the circuit court of Cook County that results in a no liability to the general contractor must have at least gotten past that point to get to the prior effect. And, therefore, those guys that were found not guilty were not insurers any more than Mervis is an insurer of the decedent here. If the decedent, if Mervis did not breach its duty or if the proximate cause did not exist connecting the damages to the breach, then Mervis still walks away. All we're talking about here is a legal question, a policy question under the classic factors. But based upon the facts of the case, you know, certainly plaintiffs went past. In fact, if I remember correctly, there were motions to dismiss file this case. The court said no. That was before a different judge. Well, sure, it was before a different judge. What I'm saying is this wasn't decided on the pleadings. This was decided on a full-blown record of depositions and testimony of expert opinion and all that type of stuff that the judge said, okay, I see the facts here. You don't have it. You know, you don't have the case here. And to go back to my statement you were saying to my brief, what we're saying there is just kind of what I was saying earlier. You'd be shocked if all of a sudden when a roofer comes off your roof, you found that you were supposed to be the one that provides the fall protection. I guess Mr. Holland would say so because Mr. Holland says we were supposed to provide bracing here, even though it wasn't part of a contract, it wasn't part of any oral or written agreement, anything. And even though plaintiff agrees that Mr. Kraft was not an employee but an independent contractor. Everyone is in agreement on that point. One of the things that strikes me as well is that, you know, depending on where you start the analysis or start the focus of the end position that you're seeking to arrive at, but you do admit that Mervis has a general duty of care to provide a safe workplace for all of its employees, including independent contractors. They can't just simply let the independent contractors come into a place that is dangerous in and of itself, a premises sort of thing, right? Well, from a premises liability case you certainly do. Yeah. Well, even from a non-premises. When you hire someone, you have a general duty to provide a safe workplace. That's black letter law. I mean, to my employees I do. And to my independent contractors. To the extent that they work in the same environment, how can you pass that duty on to one and yet exclude the other? Well, I think what we were saying in our brief is that, and we were citing the case law to say it, is that, you know what, if two workers, two subs come on the job, you know, each has to do it in a way so as not to negligently injure the other. When the bricklayer negligently builds a scaffold, then allows the painter to use the scaffold, the bricklayer has liability even though he had no relationship whatsoever with the painter. That's the kind of thing we're talking about here, but that's not what the situation was here. We didn't do anything negligent. We simply put down a piece of DRAC and said, it's yours to cut. And Mr. Corral, who was being paid by the ton, being paid by the type of metal, who was setting his own hours, who was bringing in his own porch, would cut it. So it's that type of a situation. We don't think we did anything wrong here. We don't think we provided an unsafe place to work. I want to make that clear to you that that wasn't the case here. We talked a little bit earlier, we talked a little bit earlier in the plaintiff's case about the harm to others in the restatement. The restatement makes it pretty clear, and it applies to both direct liability, provides a vicarious liability, that that's the standard in the case law. Could you give us a rationale for excluding a subcontractor that is the injured party himself? Because I think the rationales are that the contractor has got the ability to protect himself. Like if I'm a roofer, I'll go back to that, I have the ability to provide fault protection for myself. Maybe his employee does. Why would you distinguish between the subcontractor and the employee of the subcontractor being put in the identical position? Why do you think the law 414 covers the employee of the subcontractor who's doing the work and not the subcontractor himself who's doing the very same work? I think, Your Honor, because the contractor. If there's a legal duty on the part of the general contractor that's been. I think, well, if there's a legal duty, it's because there's been retained control. But the contractor has the ability to protect himself from the self-inflicted wounds, injuries, as opposed to his servants who are going to be looking to the contractor to protect him. You know, the self-inflicted language seems a bit harsh. I mean, no one self-inflicts. When I say self-inflicted, there may have been a better choice of words on my part. I'm saying an injury that he's not trying to. It's not like a suicide or anything like that. He didn't burn himself. What I'm saying is injury that he brings upon himself. If a carpenter using his own circular saw unfortunately cuts off his finger, that's the type of thing I'm talking about. Well, the self-inflicted one is more like the example that you give, the carpenter hammering in his own hand. I mean, that's self-inflicted. But to call this self-inflicted. Well, keep in mind, he had control of the sequence. He had control of the way this was done. And there was no evidence, none whatsoever, that we prohibited any bracing, that he ever requested any bracing, or that any request was ever refused. There's just no evidence. And in sending this case to a trial, we're not producing that evidence. It's not out there. That's not our concern, though, is it? Yeah, we're at duty. But I think it was the trial judge's concern, so there's no evidence. Does the fact that Mervis did not voluntarily provide bracing mean that they have failed to meet their reasonable duty of care? No, it doesn't. Why? Because there's no duty to provide it if you're an independent contractor. I mean, there's no breach until there's a duty, and there's no duty that's been stated. That's why. Thank you very much. Rebuttal. If we have some time, I'll be fast. Mr. Reagan, let me ask you one very specific question, and that concerns the question that Justice Hall just brought up. What exactly are you contending that Mervis should have done in this case in carrying out the legal duty you believe it has? Support for the piece. All right. So that once cut, it would be supported and stay there until the support was removed. And how that support was provided, Holland talks about how it could be done. It could be done by clamps. It could be done by bracing. It could be done by chains. It could be done by, I mean, there was a crane there. You put a chain on it. Support for the piece is the way it would be done. Is there any evidence, was there any, that that type of support was routinely provided in cutting these? Holland said that it was the custom and practice in the industry that everything that's being cut like this is braced. That's the evidence in the case. And he spoke in some detail. And also both Montiel said that in other jobs there was bracing used for various things, although I can't draw a strict analogy. Do you have a case that says that the expert's testimony can, in fact, establish the legal duty of a defendant? I have a case in my notes which I cannot. Well, I think there is such a case. Yeah, I believe there is. I think there's a case written by Justice Robert Gordon that involved a pool incident because I wrote a dissent in it. I remember it. And he relied on the expert who contended that the flooring of the pool reflected a depth that was greater than it actually was. And an individual dives in, cracks his head, paralyzes him. But that was the expert alone. And the factual aspects of an expert's testimony here, I mean we're not talking about a raw conclusion. We're talking about page after page after page of Holland's testimony about why this is unsafe and what should have been done differently and evidence that industry standards, industry practices require bracing. There isn't to be any deference to the trial. This is a de novo review. This is the only question before the court is whether there are material questions of fact. So the incantations about the trial judge looked at this with all due respect to the trial judge as irrelevant here. Secondly, this case was decided below as a question of law. It really was. I mean the caption of the motion was not. There's no question of fact here. The question was the direct quote is that this complaint should be dismissed, which is language of the law. We stand by our quotes in the brief. They're accurate. They're correct. They're not taken out of context. But even if he had made none of those admissions, you look at then what's left in the brief, and there is nothing in the brief which supports the trial court's rationale. There is nothing which establishes that there is no duty owed to an independent contractor himself. It's not there. So even if you want to take out all of his admissions, there's nothing left in the brief to support the trial judge on the question of duty whatsoever. The homeowner analogy was obviously to be expected to come in today. It is inapt. I avoided all analogies because these facts are dramatic enough. But, you know, maybe if you want to start looking for homeowner analogies, maybe if the homeowner had removed rafters from underneath the roof or maybe if he had removed the sidewalls and for some quirky, strange reason says, look, I still want you to work in the building, you know, that you might be getting into something there. Secondly, the homeowner who hires a roofer is hiring talent, expertise, knowledge, unique skills, and that is not the case here. And one thing about the – It wasn't the case here that they were hiring talent, expertise, skills here? They hired people who knew how to operate a torch to cut metal to cut bolts. They didn't hire somebody who knew about the safe way. They knew the safe way to cut metal. They didn't know the safe way of, you know, supporting pieces of metal that they had absolutely no practical way of ever supporting. I mean, they couldn't stand there and say, okay, bring in the crane, bring in the bracing, bring in the clamps, we're going to do this. And as Justice Garcia said in response to the argument earlier about, you know, responsibility, et cetera, you know, that takes us back to the beginning of the industrial age in this country and is just no longer the law. Now, a couple of things as long as we're talking about Corral's actions here. I think it is very important to note, and we've said it in the brief, but please look at the record. There's nothing here that suggests or supports the inference that's being told to you that Corral did something wrong, that he did something unsafe, that he did something that was different than what he'd done before. There is no evidence. Larson is the safety director. Larson says in his deposition, I have no criticism to offer of how Corral did this work. And he explains in his deposition that the brief reference he had in the after-accident report about maybe he cut bolts in a different sequence was something that Montiel had told somebody else and he didn't even know who it was. It's just a piece of hearsay sitting in there. And there is no criticism of it. There is nothing, even the defendant's brief says that there are no rules about how you, that quote's in there, there's no rules on how you cut this. And so to suggest that Corral, you know, caused this himself, there is no support for that in the evidence whatsoever. And if they want to come down and make the argument of comparative fault to a jury, they can do it. But it doesn't get them out of a trial in this case. And I think that's responsive to, Justice Hall, what you were talking about earlier. The last thing is this is indeed a policy question for the court. This is where the court looks at the question of duty as a matter of law in all the circumstances. And to permit, to affirm here, you must say that the only thing that the law looks at is how he was wielding the torch, how he cut four or five bolts. And that's all we're going to talk about. The duty here did not begin at the edge of the cutting operation, did not begin at the time of the cutting operation. The duty began in the larger enterprise of setting up the system. Thank you very much. Thank you, counsel. This is well argued. This matter will be taken under consideration.